## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Melanee B.,                                        Case No. 20-cv-1179 (ECW)

       Plaintiff,

v.                                                 **ORDER**

Kilolo Kijakazi, Acting Commissioner of
Social Security,

       Defendant.

This matter is before the Court on Plaintiff Melanee B.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 17) and Defendant's Motion for Summary Judgment (Dkt. 21). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits.

## I.   BACKGROUND

On November 17, 2016, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability as of November 30, 2015 due to Kidney Failure Stage 4, fatigue secondary to anemia, anemia, large ventral hernia, ulcer, diverticulitis, ocular migraine, sleep apnea, ovarian cyst, and anxiety.[1]  (R. 11, 72.)  Her application was denied initially and on reconsideration.  (R. 85, 104.) Plaintiff filed a written request for a hearing, and on March 19, 2019, Plaintiff appeared

---

[1]   The Social Security Administrative Record ("R.") is available at Docket Entry 16.

and testified at a hearing before Administrative Law Judge Micah Pharris ("the ALJ"). (R. 11, 39.)

The ALJ issued an unfavorable decision on April 8, 2019, finding that Plaintiff was not disabled. (R. 8-30.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of November 30, 2015. (R. 13.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: anemia, Post Intensive Care Syndrome (PICS), hypothyroidism, stage III-IV chronic kidney disease, a hernia status-post repair, ocular migraine headaches, obesity, right knee arthritis and a meniscus tear, lumbar and thoracic degenerative disc disease, fibromyalgia, and chronic fatigue. (R. 13.) The ALJ also concluded that Plaintiff's posttraumatic stress disorder ("PTSD"), major depressive disorder, and

---

[2]      The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

generalized anxiety disorder, "considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere."  (R. 14.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 18.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) except[,] the claimant may never climb ropes, ladders, or scaffolds; may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  The claimant may have no exposure to extreme cold, unprotected heights, or hazards.

(R. 19.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff could not perform her past relevant work as a nurse practitioner.  (R. 28-29.)  The ALJ also determined that given Plaintiff's age, education, work experience, and RFC, there were other jobs that exist in significant numbers in the national economy that she could perform, including Nurse Consultant (DOT 075.127-014, SVP-7), for which there are 3,200,000 jobs nationally, and clinical therapist (DOT 045.107-050, SVP-7), for which there are 9,000 jobs nationally.  (R. 29.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 11, 30.)

Plaintiff requested review of the decision.  (R. 1, 205-07.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of

the Commissioner.  (R. 1-5.)  Plaintiff then commenced this action for judicial review.
(Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular
attention to the facts and records cited by the parties.  The Court will recount the facts of
the record only to the extent they are helpful for context or necessary for resolution of the
specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

Plaintiff raises issues with respect to how the ALJ addressed Plaintiff's mental
health conditions and mental functioning.  (Dkt. 18 at 24, 26.)  As such, the Court focuses
on the facts and opinion evidence relevant to those issues and does not recount Plaintiff's
medical history since the alleged onset date in its entirety.  The ALJ's decision includes a
detailed summary of the rest of Plaintiff's medical record in the RFC determination (R.
20-26), as does Plaintiff's brief (Dkt. 18 at 3-15), both of which the Court has reviewed.
As general background, Plaintiff underwent surgery on November 30, 2015—the alleged
onset date—after which she experienced complications, including an anastomotic leak,
sepsis, and renal failure.  (R. 20, 420, 426, 440, 805.)  This resulted in more than two
months of hospitalization, from December 2015 to February 16, 2016, followed by about
a month in a nursing home, until March 28, 2016.  (R. 21 (summarizing treatment at
Regency Hospital and Glencoe Long Term Care), 26 (noting that Plaintiff "was
essentially an inpatient from November 30, 2016 to March 2016"), 677, 805, 828, 873.)
According to Plaintiff, she developed several conditions as a result of her "extended
hospitalization" that "form the basis of [her] claim for disability."  (Dkt. 18 at 3; *see also*

*id.* at 20 (stating that Plaintiff's "disability is driven by her postoperative sepsis, [sequelae], her post ICU syndrome and her post procedural septic shock," which "create the foundation for [her] other conditions including her chronic fatigue, chronic pain/fibromyalgia ocular migraine headaches, anemia, anxiety, PTSD, and depression").) The Court now turns to the medical record as relevant to Plaintiff's mental health conditions and mental functioning.[3]

A.      **Treatment Records**

While hospitalized after her surgery and postoperative complications, Plaintiff was diagnosed with reactive depression, and it was noted several times in late December 2015 that her reactive depression was improving. (R. 461 (Dec. 20, 2015 assessment and plan while hospitalized), 587, 601, 615.) On January 16, 2016, while hospitalized, it was noted in Plaintiff's illness history, "Reactive depression. The patient feels it is secondary to her wound, her deconditioning, her malnutrition, and her constant nausea. Her mood is very depressed. She is on no medications for this at this point in time." (R. 805.) In her plan regarding reactive depression, it was noted, "We will continue to assess the patient in the upcoming days and assess whether or not she would be a good candidate for an antidepressant medication. Furthermore, if she continues to show her reactive depression, then we could consider having her seen by Dr. Pollak of Psychiatry." (R. 808.) While she was in the nursing home, Dr. Bryan Petersen noted on February 17,

---

[3]      The Court notes that Plaintiff has some medical history of anxiety before her alleged onset date. (*See, e.g.*, R. 374, 398, 1472 (Nov. 20, 2015 review of systems noting "Psychiatric[:] anxiety" and listing Lorazepam on existing medications).)

2016, "The patient is with some reactive depression.  She has seen psychiatry at Regency.

Mood has been improving somewhat.  She has decided against medication or SSRI at this

time."  (R. 829; *see also* R. 831 ("Reactive depression.  This was discussed again today.

The patient does not feel that she wants an SSRI at this time but we will see how things

go and follow that closely.").)  Dr. Petersen noted on February 24, 2016, "Reactive

depression.  Did talk last week with the patient about SSRI (selective serotonin reuptake

inhibitor) or other medications; she is not wanting to do that at this point."  (R. 848.)  On

March 9, 2016, Dr. Petersen noted, "Reactive depression.  The patient has continued to

refuse antidepressant or selective serotonin reuptake inhibitor (SSRI).  Mood seems to be

improving somewhat."  (R. 868.)

After being discharged from the nursing home on April 13, 2016, Plaintiff saw

Catherine Phillips, PA-C (a physician assistant ("PA")) at Ridgeview Sibley Medical

Center.  (R. 1468.)  In the review of systems, PA Phillips noted, "Constitutional[:] has

loss of appetite and fatigue," and "Psychiatric[:] Has depression.  RELATED TO

OVERALL CONDITION."  (R. 1468-69.)

Plaintiff saw PA Phillips again on June 6, 2016.  In the review of systems, PA

Phillips noted, "Constitutional[:] has fatigue," and "Psychiatric[:] Denies anxiety,

depression, agitation and restlessness."  (R. 1460-61.)  For the physical exam, PA Phillips

noted as to Constitutional, "Normal general exam, Well nourished, alert, awake and

orientated X3," and as to Psychiatric, "Alert, oriented X3."  (R. 1462-63.)

On August 23, 2016, Plaintiff saw Dr. Petersen for a follow up on her kidney condition.  (R. 1919.)  For the physical exam, he noted, "Psychiatric Exam: patient is still tearful at times and appears somewhat anxious at times."  (R. 1922.)

Plaintiff saw PA Phillips again on September 23, 2016.  In the history of present illness, PA Phillips noted that Plaintiff presented with complaints of weakness and listed associated symptoms, but noted, "no depression and no anxiety."  (R. 1416.)  In the review of systems, PA Phillips noted, "Constitutional: malaise and fatigue," and "Psychiatric: negative."  (R. 1416.)  Vital signs included "Little interest or pleasure in doing things in the last 2 weeks[:] 0 - Not at all" and "Feeling down, depressed or hopeless in the last 2 weeks[:] 1 - Several days."  (R. 1450.)  For the physical exam, PA Phillips noted as to Constitutional, "General appearance: Abnormal[,] appears tired," and as to Psychiatric, "Orientation to person, place, and time: Normal.  Mood and affect: Abnormal.  Mood and Affect: tearful."  (R. 1450.)

On October 6, 2016, Plaintiff saw Dr. Ravi Vaela regarding obstructive sleep apnea.  (R. 2994, 2997.)  For the physical exam, Dr. Vaela noted as to Constitutional, "General appearance: Abnormal[,] obese," and as to Psychiatric, "Orientation to person, place, and time: Normal."  (R. 2995.)  Dr. Vaela noted that Plaintiff's "daytime sleepiness symptoms are not present" and stated, "Understandably, she is quite discouraged with the fact that she's had complications following her surgery last November.  . . .  Hopefully, she can come back to work soon which I think would help her mentally by helping focus her energy on others rather than her own health."  (R. 2997.)

Plaintiff saw PA Phillips again on October 24, 2016.  In the review of systems, PA Phillips noted, "Constitutional: no chills, no malaise and no fatigue," and "Psychiatric: anxiety and depression."  (R. 1415.)  Vital signs included "Little interest or pleasure in doing things in the last 2 weeks[:] 0 - Not at all," and "Feeling down, depressed or hopeless in the last 2 weeks[:] 1 - Several days."  (R. 1453.)  For the physical exam, PA Phillips noted as to Constitutional, "General appearance: Abnormal[,] chronically ill and appears tired," and as to Psychiatric, "Orientation to person, place, and time: Normal. Mood and affect: Abnormal.  Mood and Affect: depressed and tearful."  (R. 1453.)

Plaintiff saw PA Phillips again on December 7, 2016.  In the review of systems, PA Phillips noted, "Constitutional: malaise, fatigue and Chronic malaise and fatigue.  She finds it difficult to do things longer than just a few minutes before she needs to rest," and "Psychiatric: insomnia, anxiety, depression and She [sic] has on going [sic] problems of anxiety depression related to the fact that she is unable to work, and that her disease process is not getting any better."  (R. 1455.)  Vital signs included "Little interest or pleasure in doing things in the last 2 weeks[:] 1 - Several days," and "Feeling down, depressed or hopeless in the last 2 weeks[:] 1 - Several days."  (R. 1457.)  For the physical exam, PA Phillips noted as to Constitutional, "General appearance: Abnormal[,] chronically ill and Patient appears chronically ill.  She is well dressed and clean," and as to Psychiatric, "Orientation to person, place, and time: Abnormal.  Mental Status: oriented to person, place, and time and adequate knowledge of current events.  Mood and affect: Abnormal.  Mood and Affect: tearful."  (R. 1457.)

On December 20, 2016, Plaintiff saw Dr. Petersen to have a disability form completed.  (R. 1947-48.)  Dr. Petersen noted, "Patient continues with anxiety symptoms and has required some Ativan.  She's been trying to decrease the use and is down to about 0.25 mg twice a day most days.  This is related to the prolonged illness and anxiety related to her limitations and ongoing symptoms."  (R. 1948.)  For the psychiatric exam, Dr. Petersen noted, "[P]atient's awake and alert.  No apparent distress.  Affect is a little flat at times in she had times appears slightly anxious."  (R. 1951.)  He also stated, "She has reactive depression and ongoing anxiety which limit her in her ability to be involved in gainful employment as well."  (R. 1952.)  Plaintiff also completed a PHQ-9 assessment that resulted in a total score of 9, a "mild" depression severity level.  (R. 1535.)

On March 22, 2017, Plaintiff saw Kristie Kruse Psy.D., LP, where Dr. Kruse noted her chief complaint as "concerns related to depression, anxiety, and adjustment issues." (R. 1586.)  Dr. Kruse described Plaintiff's history as follows:

> [S]he has been dealing with multiple medical issues over the past couple of years that have led to her not being able to work and have contributed to feelings of depression and anxiety.  [Plaintiff] is a nurse practitioner and has been unable to work since November 2015.  She reported experiencing the following symptoms over the past 6 months: depressed mood, anhedonia, sleep difficulties, low energy, low self-esteem, worrying about a variety of things, having difficulty controlling her worries, and feeling nervous/on edge frequently.  [Plaintiff] stated she has had a tendency to downplay her mental health concerns believing she "just needs to deal with it" by herself.
>
> She also indicated she has always been "a very emotional and sensitive person" and cries frequently, this was also observed during the interview. She expressed struggling with making decisions about the future moving forward and about where her career will take her.  Although she reported she has always loved her work, she questions if she would be able to handle to stress and workflow the way she once could.

(R. 1586.)  Dr. Kruse noted a PHQ-9 total of 8, stating, "Over the prior two weeks, the patient endorsed having problems with energy nearly every day, mood more than half the days, and interest, sleep, and self-esteem for several days.  The patient denied having problems with appetite, concentration, restlessness, and suicidal ideation or thoughts of self harm . . . ."  (R. 1586.)  Dr. Kruse noted a GAD-7 total of 6, stating, "The patient reported having widespread worrying nearly every day and having anxiety, uncontrollable worrying, and trouble relaxing for several days over the last two weeks. The patient denied having restlessness, irritability, and fear of something awful happening over the last two weeks."  (R. 1587.)  Dr. Kruse's exam had the following results: Appearance: appropriate dress, adequate grooming and hygiene, other: overweight; Behavior: cooperative, good eye contact, normal psychomotor activity; Speech: normal rate, amplitude, and prosody, other: speech impediment/stuttering; Mood: sad/depressed, anxious, labile; Affect: fearful/anxious, sad/depressed; Thought process: goal directed, organized, logical; Thought content: no abnormal content, future oriented, no SI, no HI; Insight/Judgment: intact; Consciousness: alert/awake; and Orientation: Ox4. (R. 1589.)  Plaintiff was diagnosed with (1) Major depressive disorder, single episode, Moderate, Specificity: with anxious distress; and (2) Childhood-onset fluency disorder (stuttering).  (R. 1590.)  Dr. Kruse noted, Plaintiff "may wish to discuss medication options with her physician, as she may benefit from taking an anti-depressant medication."  (R. 1590.)

Plaintiff saw Dr. Petersen on April 3, 2017.  He noted, "Patient's also developed ocular migraines in the last year since the illness which have been somewhat limiting and

interfere at times.  She also has continued reactive depression and anxiety symptoms."
(R. 1956.)  He also stated, "She has been seeing a counselor in Gaylord on the
recommendation of her lawyer.  She [has] only seen her twice so far and they're still
doing their assessment.  She does not want to consider antidepressant medications.  Says
she still has bad day[s] sometimes and sometimes has some crying spells."  (R. 1957; *see
also* R. 1960 ("Reactive depression[:] patient is working with a counselor and I
encouraged her to continue that.  Did offer medication but she does not want that.").)

On April 21, 2017, Plaintiff saw Physician Assistant Kari Knodel-Vettel regarding
obesity.  (R. 1969.)  Reviewing Plaintiff's medical history, PA Knodel-Vettel noted,
"With all of this grief and prolonged illness, she is seeing a therapist. . . .  She is seeing a
counselor but has not wanted medicine for mood from Dr. Petersen. . . .  I told her . . .
there are several challenges here considering her illness in the last year, grief in dealing
with this illness, and multiple medical conditions."  (R. 1969-70.)

Plaintiff saw PA Phillips on May 18, 2017.  In the review of systems, PA Phillips
noted, "Constitutional: malaise and fatigue," and "Psychiatric: anxiety and depression,
but not suicidal."  (R. 2998-99.)  Vital signs included "Little interest or pleasure in doing
things in the last 2 weeks[:] 0 – Not at all," and "Feeling down, depressed or hopeless in
the last 2 weeks[:] 0 – Not at all."  (R. 3000.)  For the physical exam, PA Phillips noted
as to Constitutional, "General appearance: No acute distress, well appearing and well
nourished.  [W]ell developed, uncomfortable, disheveled clothing and unkempt
appearance," and as to Psychiatric, "Orientation to person, place, and time: Normal.
Mood and affect: Normal."  (R. 3000.)  PA Phillips noted, "She is very tearful during our

exam and visit today.  Her frustration is in not knowing, and her ongoing kidney disease."
(R. 3002.)

On May 24, 2017, Plaintiff was seen regarding some cysts.  (R. 3027.)  The
physical exam noted, "Neurological/Psychiatric: Orientation to person, place, and time:
Normal.  Mood and affect: Normal."  (R. 3029.)

On July 24, 2017, Plaintiff saw Dr. Petersen, who noted, "She has developed
ocular migraines which [has] limited her as well.  Also has reactive depression and
anxiety," and "Patient does continue to see psychologist for counseling which has been
helpful."  (R. 1997-98.)  He also noted regarding her reactive depression, "[S]ymptoms
slowly improving.  Continue to work with her counselor/psychologist.  I have offered
medication but patient does not want to do that."  (R. 2003.)

Plaintiff saw PA Phillips on September 6, 2017.  In the review of systems, PA
Phillips noted, "Constitutional: malaise and fatigue," and "Psychiatric: anxiety and
depression."  (R. 3011.)  A PHQ-9 assessment showed a total score of 5, including
"Feeling down, depressed or hopeless[:] 2 - More than half the days," "Feeling tired or
having little energy[:] 1 - Several days," and "Feeling bad about yourself or that you are a
failure or have let yourself or your family down[:] 2 - More than half the days," and the
response to "How difficult have these problems made it for you to do your work, take
care of things at home or get along with others" was "Very difficult."  (R. 3011-12.)  For
the physical exam, PA Phillips noted as to Constitutional, "General appearance: No acute
distress, well appearing and well nourished."  (R. 3013.)

On October 10, 2017, Plaintiff saw Dr. Kruse, where they discussed "her thoughts and feelings about her upcoming surgery." (R. 1574.)  Dr. Kruse's exam had the following results: Appearance: appropriate dress, adequate grooming and hygiene; Behavior: Cooperative, Good Eye Contact, Normal Psychomotor Activity; Speech: Normal Rate, Amplitude, and Prosody; Mood: Anxious; Affect: Fearful/Anxious; Thought process: Goal Directed, Organized, Logical; Thought content: No Abnormal Content, Future Oriented, No SI, No HI; Insight/Judgment: Intact; Consciousness: Alert/Awake; and Orientation: Ox4. (R. 1575.)  Plaintiff was diagnosed with (1) Major depressive disorder, single episode, Moderate, Specificity: with anxious distress, and (2) Childhood-onset fluency disorder (stuttering). (R. 1575.)

On October 11, 2017, Plaintiff was seen for a preoperative visit before a hernia repair. (R. 3003.)  In the review of systems, PA Phillips noted, "Constitutional: fatigue, but no fever and no malaise," and "Psychiatric: anxiety and depression." (R. 3003.) Vital signs included "Little interest or pleasure in doing things in the last 2 weeks[:] 0 – Not at all," and "Feeling down, depressed or hopeless in the last 2 weeks[:] 0 – Not at all." (R. 3005.)  For the physical exam, PA Phillips noted as to Constitutional, "General appearance: Abnormal.  [W]ell developed, chronically ill, well nourished, overweight, clothing appropriate, well groomed and appears younger than stated age," and as to Psychiatric, "Judgment and insight: Normal.  Orientation to person, place, and time: Normal.  Recent and remote memory: Intact.  Mood and affect: Normal." (R. 3005.)

On November 13, 2017, Plaintiff was again seen for a preoperative visit before a hernia repair. (R. 3016.)  In the review of systems, PA Phillips noted, "Constitutional:

fatigue, but no fever and no chills," and "Psychiatric: anxiety and depression."  (R. 3016.)

For the physical exam, PA Phillips noted as to Constitutional, "General appearance: No

acute distress, well appearing and well nourished," and as to Psychiatric, "Judgment and

insight: Normal.  Orientation to person, place, and time: Normal.  Recent and remote

memory: Intact.  Mood and affect: Normal."  (R. 3018.)

On November 20, 2017, Plaintiff saw Dr. Petersen, who again noted, "She has

developed ocular migraines which [has] limited her as well.  Also has reactive depression

and anxiety," and "Patient does continue to see psychologist for counseling which has

been helpful."  (R. 2007-08.)

Plaintiff saw PA Phillips on November 29, 2017 for a follow up after hernia

surgery.  (R. 3022.)  In the review of systems, PA Phillips noted, "Psychiatric: anxiety

and depression."  (R. 3022.)  A PHQ-9 assessment showed the same results as those on

September 6, 2017.  (R. 3022-23.)  For the physical exam, PA Phillips noted as to

Constitutional, "General appearance: Abnormal.  [C]hronically ill, uncomfortable, does

not smell of feces, does not smell of urine, overweight, clothing appropriate, well

groomed, appears tired and appearance reflects stated age," and as to Psychiatric, "Mood

and affect: Abnormal.  Mood and Affect: concerned and tearful."  (R. 3025.)

On January 18, 2018 Plaintiff saw Kristie Schaefer Psy.D., L.P.,[4] where they

discussed "her recent surgery and how she is recovering."  (R. 1577.)  Dr. Schaefer

described their discussion further as follows:

_____

[4]      It is possible that Dr. Kruse and Dr. Schaefer are the same person: they share a
first name, and Plaintiff states that "[a]ll of [her psychological] care and treatment has

> She was very emotional, cried throughout much of the session, and reported that although her recent surgery went well she has been struggling with past thoughts about her first surgery. She admitted that she believes she has minimized how much she is struggling with her past and endorsed having nightmares, difficulty talking about it, and explained that she feels she was grossly mistreated. She shared more details of her difficult recovery and experience in the hospital. Next session plan to review PTSD criteria.

(R. 1577.) Dr. Schaefer's exam had the following results: Appearance: appropriate dress, adequate grooming and hygiene; Behavior: Cooperative, Normal Psychomotor Activity, Intermittent Eye Contact, Other: cried; Speech: Normal Rate, Amplitude, and Prosody; Mood: Sad/Depressed, Anxious; Affect: Fearful/Anxious, Sad/Depressed; Thought process: Goal Directed, Organized, Logical; Thought content: No Abnormal Content, Future Oriented, No SI, No HI; Insight/Judgment: Intact; Consciousness: Alert/Awake; and Orientation: Ox4. (R. 1578.) Plaintiff was diagnosed with (1) Major depressive disorder, single episode, Moderate, Specificity: with anxious distress, and (2) Childhood-onset fluency disorder (stuttering). (R. 1578.)

On February 15, 2018, Plaintiff saw Dr. Schaefer again, where they discussed "her story of her surgery and explored how this impacted her." (R. 1580.) Dr. Schaefer described their discussion further as follows:

> She had a tendency to downplay her experience and expressed a common cognitive distortion that this shouldn't impact her so negatively. She was provided with psychoeducation about how trauma can impact a person and

---

been done with Dr. Kristie Schaefer" and cites to pages 1565 through 1591 of the Administrative Record (Dkt. 18 at 14-15), which includes the records from Plaintiff's March 22 and October 10, 2017 sessions with Dr. Kruse (R. 1586-91, 1574-76). Further, on a form dated April 4, 2018, Dr. Schaefer states that she saw Plaintiff on October 10, 2017. (R. 1565, 1568.) However, between the two 2017 sessions with Dr. Kruse, Dr. Schaefer's name appears on a May 4, 2017 Mental Impairment Questionnaire (R. 1599), so it is not clear whether these two psychologists are the same person.

> provided with validation for her experience.  She expressed hesitancy to write a letter to the hospital administration about her experience due to believing it won't make a difference anyway.  We discussed the pros and cons of doing this.

(R. 1580.)  Dr. Schaefer's exam had the following results: Appearance: appropriate dress, adequate grooming and hygiene; Behavior: Cooperative, Normal Psychomotor Activity, Intermittent Eye Contact, Other: cried; Speech: Normal Rate, Amplitude, and Prosody; Mood: Sad/Depressed, Anxious; Affect: Fearful/Anxious, Sad/Depressed; Thought process: Goal Directed, Organized, Logical; Thought content: No Abnormal Content, Future Oriented, No SI, No HI; Insight/Judgment: Intact; Consciousness: Alert/Awake; and Orientation: Ox4.  (R. 1581.)  Plaintiff was diagnosed with (1) Major depressive disorder, single episode, Moderate, Specificity: with anxious distress, and (2) Childhood-onset fluency disorder (stuttering).  (R. 1581.)

On March 26, 2018, Plaintiff again saw Dr. Schaefer, where they discussed "the idea of working again and her current limitations."  (R. 1583.)  Dr. Schaefer described their discussion further as follows:

> This was a very emotional topic for Melanie as she expressed wanting to work very badly but not believing she is able to work the way she did previously.  We discussed the ways in which she feels limited and engaged in problem-solving about alternatives to her previous job.  She also described experiencing intrusive thoughts from a childhood trauma (molestation by uncle) and expressed feeling confused why these memories and thoughts are popping up now when she thought she was "past this."  This provider explained that this thought may have been triggered by feelings of helplessness from her traumatic hospital experiences.  Plan to begin with this topic next session.

(R. 1583.)  Dr. Schaefer's exam had the following results: Appearance: appropriate dress, adequate grooming and hygiene; Behavior: Cooperative, Normal Psychomotor Activity,

Intermittent Eye Contact, Other: cried; Speech: Normal Rate, Amplitude, and Prosody;

Mood: Sad/Depressed, Anxious; Affect: Fearful/Anxious, Sad/Depressed; Thought

process: Goal Directed, Organized, Logical; Thought content: No Abnormal Content,

Future Oriented, No SI, No HI; Insight/Judgment: Intact; Consciousness: Alert/Awake;

and Orientation: Ox4.  (R. 1584.)  Plaintiff was diagnosed with (1) Major depressive

disorder, single episode, Moderate, Specificity: with anxious distress, and (2) Childhood-

onset fluency disorder (stuttering).  (R. 1584.)

　　　In addition to a regular appointment on February 15, 2018, Plaintiff saw Dr.

Schaefer for a psychological evaluation, which Dr. Schaefer completed on April 4, 2018.

(R. 1569, 1573.)  For Mental Status Exam/Behavioral Observations, Dr. Schaefer noted

as follows:

> [Plaintiff] arrived on time for her scheduled appointment.  She presented as
> casually dressed and adequately groomed.  She displayed good eye contact
> and was alert.  She was goal-directed and oriented X3.  Her range of affect
> was broad and mood was anxious.  [Plaintiff]'s tone and volume of speech
> were appropriate.  She exhibited adequate judgement and insight into her life
> stressors.  She denied current homicidal or suicidal ideation.

(R. 1569.)

　　　For test results, first, Dr. Schaefer reported as follows for the Minnesota

Multiphasic Personality Inventory-2 Restructured Form:

> [Plaintiff]'s responses on the MMPI-2-RF suggest the possibility of over-
> reporting somatic and/or cognitive symptoms.  While this can sometimes
> reflect exaggeration, in [Plaintiff]'s case it is more than likely an accurate
> reflection of her numerous medical concerns.  There is also evidence of
> possible under-reporting.  [Plaintiff] presented herself in a positive light by
> denying some minor faults and shortcomings that most people acknowledge.
> This level of virtuous self-presentation may reflect a background stressing
> traditional values.

[Plaintiff] reports a diffuse and pervasive pattern of somatic complaints involving different bodily systems including head pain, vague neurological complaints, and a number of gastrointestinal complaints. She is likely to have a history of gastrointestinal problems. She is also very likely to have a psychological component to her somatic complaints. In addition, she is likely to be prone to developing physical symptoms in response to stress. She also reports a general sense of malaise manifested in poor health, and feeling tired, weak, and incapacitated. She is very likely to be preoccupied with poor health and to complain of sleep disturbance, fatigue, low energy, and sexual dysfunction.

[Plaintiff] reports feeling anxious and is likely to experience significant anxiety and anxiety-related problems, intrusive ideation, and nightmares. She is also likely to be stress-reactive and worry-prone and to engage in obsessive rumination.

(R. 1570.)

Second, Dr. Schaefer reported as follows for the Trauma Symptom Inventory-2:

[Plaintiff] produced a valid profile: she answered all questions and appeared to do so in an honest manner. There are no indications of over or under-reporting. [Plaintiff]'s responses on the TSI-2 are indicative of numerous trauma symptoms. Her scores were in the *problematic* or *clinically elevated* range in the following factors and scales: *Posttraumatic Stress, Somatization, Anxious Arousal, Anxiety, Hyperarousal, Intrusive Experiences, Defensive Avoidance, Somatic Preoccupations (pain and general)*. Her overall profile is consistent with individuals who have experienced significant trauma.

Individuals who respond similarly to [Plaintiff] are likely to struggle with flashbacks, nightmares, intrusive or triggered memories, cognitive and/or behavioral avoidance of reminders of previous traumatic events, sympathetic hyperarousal, and dissociative symptoms. [Plaintiff]'s responses are also suggestive of heightened levels of anxiety related to irrational fears, panic, and nervousness. She is likely to have trouble with hyperarousal resulting in jumpiness, hypervigilance, irritability, and sleep disturbance.

[Plaintiff]'s responses further suggest she is experiencing preoccupation with physical symptoms and complaints. Individuals who respond similarly are like [sic] to complain of aches and pains and chronic medical or physical symptoms. While elevations on the Somatic Preoccupations scale can be indicative of experiencing physical complaints due to a psychological origin,

in [Plaintiff]'s case it is more likely her physical complaints are due to actual medical concerns.

(R. 1571.)

Dr. Schaefer diagnosed Plaintiff with PTSD and Generalized Anxiety Disorder with Panic Attacks." (R. 1571-72.) She further stated, "A rule-out of Panic Disorder is also being added, as [Plaintiff] currently suffers from panic attacks, but does not meet criteria for having consistent worry about having attacks, nor has she made significant changes in her behavior due to the attacks," and retained Plaintiff's previous diagnoses of Major Depressive Disorder, single episode, Moderate and Childhood-onset Fluency Disorder (stuttering). (R. 1573.) Dr. Schaefer recommended "that [Plaintiff] participate in individual therapy to reduce her mood symptoms and anxiety," noting that Plaintiff "would likely benefit from the use of supportive therapy, CBT strategies, and/or EMDR to process her trauma," and stated that Plaintiff "may also be a good candidate for psychotropic medication to help manage her mood and anxiety." (R. 1573.)

Plaintiff saw PA Phillips on April 30, 2018. Some of the clinical notes appear to be based on a visit with Dr. Joseph Lee. (R. 3036.) In the review of systems, PA Phillips noted, "Constitutional: malaise and fatigue," and "Psychiatric: anxiety and [h]as a Clinical diagnosis of PTSD, but not suicidal." (R. 3031.) A PHQ-9 assessment showed the same results as those on September 6, 2017. (R. 3031-32.) For the physical exam, PA Phillips noted as to Constitutional, "General appearance: Abnormal. [C]hronically ill, uncomfortable, does not smell of feces, does not smell of urine, overweight, clothing appropriate, well groomed, appears tired and appearance reflects stated age," and as to

Psychiatric, "Orientation to person, place, and time: Normal.  Recent and remote memory: Intact.  Mood and affect: Abnormal.  Mood and Affect: tearful."  (R. 3034.)  PA Phillips noted, "Continues to have anxiety and does have a clinical diagnosis of posttraumatic stress disorder.  She has panic attacks when she is in public."  (R. 3036; *see also* R. 3037 (noting at same visit that Plaintiff "suffers from a clinical diagnosis of PTSD, please see her notes from her that she has ongoing panic attacks").).)

Plaintiff saw PA Phillips again on June 11, 2018.  In the review of systems, PA Phillips noted, "Constitutional: malaise and fatigue," and "Psychiatric: insomnia, anxiety and depression, but no irritability and not suicidal."  (R. 3038.)  A PHQ-9 assessment showed a total score of 6, noting that this is "mild" severity of depression, and showed the following scores: "Feeling down, depressed or hopeless[:] 1 - Several days" (previous tests showed "2 - More than half the days"), "Trouble falling asleep or sleeping too much[:] 2 - More than half the days" (previous tests showed "0 - Not at all"), "Feeling tired or having little energy[:] 3 - Nearly every day" (previous tests showed "1 - Several days"), and "Feeling bad about yourself or that you are a failure or have let yourself or your family down[:] 0 - Not at all" (previous tests showed "2 - More than half the days"). (R. 3038-39.)  A GAD 7 assessment showed a total score of 8, which is "Mild Anxiety," with "1 - Several days" noted for "Feeling nervous, anxious or on edge"; "Not being able to stop or control worrying"; Worrying too much about different things"; "Trouble relaxing"; "Being so restless that it is hard to sit still"; and "Becoming easily annoyed or irritated," then "2 - more than half the days" noted for "Feeling afraid as if something awful might happen."  (R. 3038-39.)  For the physical exam, PA Phillips noted as to

20

Constitutional, "General appearance: Abnormal.  [C]hronically ill, uncomfortable, does not smell of feces, does not smell of urine, overweight, clothing appropriate, well groomed, appears tired and appearance reflects stated age," and as to Psychiatric, "Judgment and insight: Normal.  Orientation to person, place, and time: Normal.  Recent and remote memory: Intact.  Mood and affect: Abnormal.  Mood and Affect: tearful." (R. 3041.)

Plaintiff saw PA Phillips again on June 27, 2018.  In the review of systems, PA Phillips noted, "Constitutional: malaise and fatigue."  (R. 3044.)  A PHQ-9 assessment showed a total score of 4 ("None" for severity of depression), a decrease from 6 ("Mild") sixteen days prior, and a GAD 7 assessment showed a total score of 12 ("Moderate Anxiety"), an increase from 8 ("Mild Anxiety") sixteen days prior.  (R. 3044-45.)  PA Phillips noted that Plaintiff continued to suffer from the effects of her postoperative sepsis and extended ICU stay, such as "chronic fatigue, pain, decreased memory function."  (R. 3048.)

On July 9, 2018, Plaintiff saw Dr. Petersen, whose progress notes state: "Patient continues to be fairly fatigued and tired most [sic] the time she is making slow progress but it is difficult" and "She has been told that she is just depressed by her long-term disability provider but she disagrees with that.  She does not feel that she is particularly down depressed.  She is just real fatigue[d] still much time [sic]."  (R. 2041.)  He went on to say, "She does see a therapist feels that she does have [PTSD] related to the surgery and sepsis and prolonged recovery."  (R. 2041.)  Dr. Petersen also stated, "Patient is not really ready to try going back to work at this point.  She feels that if she even tried part-

time she would get very fatigued with distress and not be able to manage well with her life.  She does feel that she is still slowly improving." (R. 2041.)

Plaintiff saw Dr. Petersen again on October 5, 2018.  He noted, "At our last visit the patient continued to complain of being fairly fatigued and tired most the time and making only very slow progress with her stamina.  She has been working with a therapist who felt that she likely has some [PTSD] related to the surgery, sepsis and prolonged recovery." (R. 2065.)  He also noted, "They have diagnosed post intensive care syndrome as well as postoperative sepsis sequelae as the patient continues to have ongoing problems of chronic fatigue, depression, generalized anxiety, difficulty concentrating and retaining new information with cognitive difficulties as well as ongoing physical limitations." (R. 2065.)  Dr. Petersen continued, "Patient does continue to follow with psychologist.  Did more fold psychology evaluation in February of this year with Kristie Schaefer, licensed psychologist.  Did confirm diagnosis of that time of generalized anxiety disorder with panic attacks, major depressive disorder moderate, [PTSD].  Patient continues to follow with the psychologist regularly." (R. 2065.)  Later in his notes, Dr. Petersen stated, "Patient continues to have significant anxiety symptoms and PTSD.  Her therapist also feels that she is depressed.  Patient states she does not feel devastated or hopeless but she does feel sad about her situation." (R. 2065.)

Plaintiff saw PA Phillips on October 8, 2018.  In the review of systems, PA Phillips noted, "Constitutional: malaise and fatigue," and "Psychiatric: anxiety and depression, but no insomnia and not suicidal." (R. 3049.)  A PHQ-9 assessment showed a total score of 4 ("None" for severity of depression), the same total as on June 27, and a

GAD 7 assessment showed a total score of 10 ("Moderate Anxiety"), a decrease from 12 on June 27. (R. 3049-50.) For the physical exam, PA Phillips noted as to Constitutional, "General appearance: Abnormal. [C]hronically ill, uncomfortable, overweight, clothing appropriate, well groomed, and appearance reflects stated age," and as to Psychiatric, "Orientation to person, place, and time: Normal. Mood and affect: Normal." (R. 3052.) PA Phillips noted that Plaintiff continued to suffer from the effects of her postoperative sepsis and extended ICU stay, "such as chronic fatigue[,] pain, decreased memory function, difficulty concentrating . . . ." (R. 3052.) PA Phillips stated, "Ongoing and worsening impairments and physical cognitive and mental health status rising after critical illness and persisting be on [sic] acute care hospitalization," however, it is not clear whether she was directing this statement at Plaintiff's specific condition or at general populations who have had acute care hospitalization, as PA Phillips went on to say, "This term can be applied to his [sic] survival of someone who has been in the intensive care," and describe findings of studies. (R. 3053.)

On November 14, 2018, Plaintiff saw Dr. Robert Tierney regarding chronic fatigue. (R. 3056.) For the physical exam, he noted, "[S]he broke down crying several times through the interview, told me about the fatigue and the fact that she cannot go back to work." (R. 3058.) In his assessment, he noted, "She has been diagnosed with chronic fatigue and with post ICU syndrome which I would not comment on, but certainly it seems like she would have." (R. 3059.)

Plaintiff was prescribed Lorazepam for anxiety throughout the relevant medical history, as well as before the alleged onset date. (*See, e.g.*, R. 746, 811, 1457, 3000, 3014, 3035, 3042, 3052; *supra* n.3.)

## B.     Medical Opinions

PA Phillips completed a residual functional capacity questionnaire on December 12, 2016. (R. 1510.) She indicated that one of Plaintiff's symptoms was, "Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities." (R. 1506.) She indicated that the following mental findings had been documented by mental status examination or psychological testing: short term memory deficit, visual-spatial difficulties, concentration limitations, depression, anxiety, and ocular migraines. (R. 1507.) PA Phillips indicated that emotional factors did not contribute to the severity of Plaintiff's symptoms and functional limitations and that, during a typical workday, Plaintiff's experience of fatigue or other symptoms were "constantly" severe enough to interfere with the attention and concentration needed to perform simple work tasks. (R. 1507-08.)

Dr. Petersen completed a residual functional capacity questionnaire on December 20, 2016. (R. 1522.) He indicated that one of Plaintiff's symptoms was, "Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities." (R. 1518.) He indicated that the following mental findings had been documented by mental status examination or psychological testing: short term memory deficit, visual-

spatial difficulties, concentration limitations, depression, anxiety, and ocular migraines. (R. 1519.)  Dr. Petersen indicated that emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations and that, during a typical workday, Plaintiff's experience of fatigue or other symptoms were "frequently" severe enough to interfere with attention and concentration needed to perform simple work tasks.  (R. 1519-20.)

A state agency consulting psychologist stated on January 31, 2017 that the objective medical evidence supported a light RFC, and that the medical source statement was not completely consistent with the available objective medical evidence in the record.  (R. 80.)

Monique Bourdeaux-Colburn, Psy.D., LP completed a psychological evaluation on January 27, 2017.  (R. 1544.)  Dr. Bourdeaux-Colburn's review of Plaintiff's signs and symptoms noted, "She also noted her overall symptoms have improved.  She reported that she has been having problems with . . . some depression and anxiety."  (R. 1544.)  Dr. Bourdeaux-Colburn's clinical observations from Plaintiff's mental status exam were as follows:

> **Appearance**: She appeared at the interview looking her chronological age. Her posture, health, and grooming were within normal limits.  There was nothing unusual about her physical appearance.  She appeared to be in good health.
>
> **Activity Level**: There were no unusual gestures or mannerisms.  Her activity level was within normal limits.  She was not limp, rigid, lethargic, combative, or hyperactive.  She did not appear to be preoccupied or easily distracted. She sat still the entire time.  She appeared to be relaxed and alert.  Accessory movements were normal.

**Speech**: Her speech was clear and 100% understandable.  She showed normal volume, vocabulary, details, pronunciations, sentence structure, and reaction time.  Speech was not slurred, stuttered, hesitant, mumbled, or monotonous.

**Attitude toward examiner**: She was cooperative and attentive and seemed interested in the interview.  She appeared to be an adequate historian.  She did not appear to be defiant, guarded, defensive, evasive. hostile, or manipulative.

**Affect**: Overall, her affect was fairly stable.  Some tears were noted but this was understandable given the topic she was discussing.

**Mood**: When asked about her typical mood, she stated "in general good, but sometimes sad."  She did endorse symptoms of depression (lack of pleasure, fatigue, difficulty with concentration and focus) as well as anxiety (fatigue, sleep disturbance) which she attributed to concerns about her physical health, loss of job and financial concerns.  This is suggestive of an Adjustment Disorder with mixed anxiety and depressed mood.  No other mental health concerns were noted.

**Stream of Consciousness**: There was no evidence of a thought disorder.  No concerns were noted regarding quality of speech or thought.  She was coherent, logical, goal-directed and relevant.  No concerns were noted regarding obsessions, compulsions, suicidality, hallucinations, illusions, delusions, or ideas of reference.

**Substance Abuse**: No concerns are noted in this area.

**Sensorium/Cognition**: She was in touch with reality and was oriented X3.  She held a normal conversation.

**Attention/Concentration**: She remained seated during the entire interview, followed directions, and understood every question.  She did not stare into space or easily shift focus.  She did not talk excessively, blurt out answers, interrupt, nor was she easily distracted.  She was not fidgety or impulsive.

She adequately counted by 3s beginning with 1 such as 1,4,7.  She correctly counted backward from 100 by 7s.  She correctly said the months of the year forward and backward.  She correctly spelled the word WORLD forward and backward.  She correctly multiplied 7x8, 12x6 and 12x12.  She repeated 7 digits forward and 5 digits backward, which is adequate.

**Memory**: She recalled 3 of 3 words immediately and after five and thirty minutes. She remembered the names of previous schools, teachers' names, recent meals and recent events in her life. When asked about her memory, she stated "I often lose my train of thought."

**Information**: She does not watch the news. She knew Trump was president. She knew the names of 3 out of 3 of the most recent presidents.

**Abstractive Capacity**: She abstractly interpreted the proverb "the early bird catches the worm."

**Judgment**: When asked what she would do if she was the first person to see smoke or fire in a theater, she stated that she would "yell fire and run or might pull the fire alarm."

(R. 1545-46.) Dr. Bourdeaux-Colburn diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood and noted a prognosis of moderate to guarded. (R. 1547.) Dr. Bourdeaux-Colburn gave a medical sources statement as follows:

Based on this psychologist's findings, she is able to understand and follow directions. She is able to sustain attention and concentration. She is able to carry out work-like tasks with reasonable persistence and pace. She is able to relate appropriately with at least brief and superficial contact with coworkers and supervisors. She was friendly and appropriate with this examiner and tolerated the interview well. She is able to tolerate the mental stressors of at least an entry level workplace. Her main stated concerns are primarily physical stressors.

(R. 1546.)

A state agency consulting psychologist stated, in a reconsideration on April 12, 2017, that Plaintiff "Continues to have some anxiety symptoms, but has been able to decrease reliance on PRN medication to treat anxiety. Initial evaluation remains appropriate." (R. 99.)

Dr. Schaefer completed a mental impairment questionnaire on May 4, 2017.  (R. 1599.)[5]  Dr. Schaefer listed diagnostic impressions of major depressive disorder, single episode moderate with anxious distress and childhood-onset fluency disorder (stuttering). (R. 1594.)  In response to the form's request to "Describe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms," Dr. Schaefer wrote, "Please see diagnostic assessment."  (R. 1594.)  No assessment appears to be attached to or follow Dr. Schaefer's questionnaire in the Administrative Record, so it is not clear what assessment this was meant to refer to.

Dr. Schaefer indicated that Plaintiff had "Marked" functional limitations as a result of her mental impairments in the areas of "Understand, remember, or apply information" and "Concentration, persistence, or pace"; that Plaintiff had "Moderate" limitations in the area of "Adapt or manage oneself"; and "Mild" limitations in the area of "Interact with others."  (R. 1595.)  In response to the form's prompt to "[e]xplain limitations falling in the marked or extreme categories and include the medical/clinical

---

[5]     The Court notes that on this opinion form, Dr. Schaefer states, "I have seen [Plaintiff] for an intake and 4 therapy sessions."  There is no record in the Administrative Record of Plaintiff having seen Dr. Schaefer prior to May 4, 2017.  This is potentially explained by the possibility that Dr. Kruse and Dr. Schaefer are the same person (*see supra* n.4), but even if that is the case, there is only a record for one appointment, on March 22, 2017 (R. 1586-90), before this opinion.  Plaintiff appears to date this opinion in 2018—at which time Plaintiff had seen Dr. Schaefer at least four times—rather than 2017 (Dkt. 18 at 15), but the date on the opinion itself is 2017 (R. 1594, 1599), and Plaintiff's description of this opinion contains material that does not appear in the opinion (Dkt. 18 at 15-16 (citing R. 1592-99) (referring to, *e.g.*, "debilitating anxiety that occurs out of the blue," "panic" or "panic-like symptoms," "intrusive ideation from trauma," and "crying spells")).  This description appears to instead fit Dr. Schaefer's April 4, 2018 opinion, described below.  (*See* R. 1565-68.)

findings that support this assessment," Dr. Schaefer wrote, "[Plaintiff] has experienced significant medical issues which have led to numerous mental health symptoms.  She currently struggles with depression, emotional lability, and anxiety symptoms.  She has been more forgetful, has trouble concentrating, and is not able to be as independent as she once was."  (R. 1595.)

Dr. Schaefer identified the following as Plaintiff's signs and symptoms: Anhedonia or pervasive loss of interest in almost all activities, decreased energy, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, emotional lability, and sleep disturbance.  (R. 1596.)

Regarding Plaintiff's ability to do work-related activities for unskilled work, Dr. Schaefer checked: "Unable to meet competitive standards" for completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to changes in a routine work setting, and dealing with normal work stress; "Seriously limited, but not precluded" for remembering work-like procedures, maintaining attention for two hour segments, maintaining regular attendance and being punctual within customary, usually strict tolerances, and accepting instructions and responding appropriately to criticism from supervisors; "Limited but satisfactory" for sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, asking simple questions or request assistance, and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and

"Unlimited or Very Good" for understanding and remembering very short and simple instructions, carrying out very short and simple instructions, and being aware of normal hazards and take appropriate precautions.  (R. 1597.)  In response to the form's prompt to "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment," Dr. Schaefer wrote, "[Plaintiff]'s current emotional difficulties would likely impair her ability to stay on task, follow-directions, and work with others."  (R. 1597.)

Regarding Plaintiff's ability to do work-related activities for semiskilled work, Dr. Schaefer checked: "Unable to meet competitive standards" for understanding and remembering detailed instructions, carrying out detailed instructions, and dealing with the stress of semiskilled and skilled work; and "Seriously limited, but not precluded" for setting realistic goals or making plans independently of others.  (R. 1598.)  Regarding Plaintiff's ability to do work-related activities for particular types of jobs, Dr. Schaefer checked: "Seriously limited, but not precluded" from maintaining socially appropriate behavior; "Limited but satisfactory" for travelling in unfamiliar places; and "Unlimited or Very Good" for interacting appropriately with the general public, adhering to basic standards of neatness and cleanliness, and using public transportation.  (R. 1598.)  No information was provided in response to the form's prompt to "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment" for semiskilled work nor for particular types of jobs.  (*See* R. 1598.)

Dr. Schaefer selected options on the form indicating that Plaintiff's impairments or treatment would cause her to be absent from work more than four days per month on average; that Plaintiff's impairment lasted or can be expected to last at least twelve months, that Plaintiff was not a malingerer; and that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (R. 1599.) In response to the question, "Does your patient's mental health preclude them from working with the general public?" Dr. Schaefer checked "Yes" and wrote, "At this time the stress would likely be too much to handle." (R. 1599.)

Dr. Schaefer completed a form for Hartford Life and Accident Insurance Co. for Plaintiff's claim for Long Term Disability Benefits on April 4, 2018. (R. 1565, 1568.) (This is the same date that Dr. Schaefer completed a psychological evaluation, described in Section II.A. (*See* R. 1569-73.)) In response to a request for Plaintiff's current psychiatric limitations along with the objective findings to support any psychiatric limitations, Dr. Schaefer wrote, "Current psychiatric limitations include debilitating anxiety that occurs out of the blue and causes panic symptoms, labile mood many days, poor concentration, low energy levels, intrusive ideation from trauma, and uncontrolled crying spells." (R. 1566.) In response to whether Plaintiff's "psychiatric symptoms alone [are] significant enough to impair her functionality in the absence of any physical problems, that is, if the mental/emotional symptoms were the only difficulties," Dr. Schaefer wrote as follows:

> Yes, [Plaintiff]'s symptoms would make it exceptionally difficult to work. She could be easily triggered which would result in her developing panic-like symptoms, crying, and an inability to be productive. In addition, her low

energy and poor concentration would make it difficult to be consistent in work completion.

(R. 1566.)  Regarding the current treatment plan in place to increase Plaintiff's current level of functionality, Dr. Schaefer wrote as follows:

> Cognitive-behavior therapy to work on replacing distorted thinking with healthier thoughts, behavior strategies, coping skills, process past trauma. [Plaintiff] has been referred for a medication consultation, but she is not interested at this time due to the potential negative impact on her kidneys.

(R. 1566.)  Dr. Schaefer indicated that Plaintiff could complete her activities of daily living "with some limitations" and that Plaintiff is able to interact with others, maintain her home, shop as needed, drive as needed, manage her medications, and manage her finances, stating, "[T]his is possible due to a lack of flexibility at home.  She is able to rest as needed and take as much time as necessary to complete these tasks (which is not an option for most jobs)."  (R. 1567.)  Regarding a maximum number of hours per day and hours per week that Plaintiff had occupational function, Dr. Schaefer wrote, "[D]ifficult to say – it would vary greatly from day to day."  (R. 1568.)  Dr. Schaefer additionally wrote, "[Plaintiff] would likely only be able to work under extremely flexible circumstances (i.e. being able to work when she feels she can, take breaks anytime, etc.)."  (R. 1568.)

An October 7, 2018 opinion from Dr. Petersen on a form titled "Post-Sepsis Syndrome Residual Functional Capacity Questionnaire" noted Plaintiff's diagnoses of PICS (Post ICU Syndrome), PTSD, depression, anxiety, and chronic fatigue.  (R. 2076.) In describing Plaintiff's history of fatigue, Dr. Petersen noted, "Decreased cognitive function."  (R. 2076.)  He stated that emotional factors contribute to the severity of

Plaintiff's symptoms and functional limitations and that, during a typical workday, Plaintiff's experience of fatigue or other symptoms were "constantly" severe enough to interfere with attention and concentration needed to perform simple work tasks.  (R. 2079.)

An October 11, 2018 opinion from PA Phillips on the form titled "Post-Sepsis Syndrome Residual Functional Capacity Questionnaire" indicated that the following mental findings had been documented by mental status examination or psychological testing: short term memory deficit, concentration limitations, depression, information processing limitations, comprehension problems, and anxiety.  (R. 2086.)  Regarding whether emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, PA Phillips wrote, "Unknown," and indicated that, during a typical workday, Plaintiff's experience of fatigue or other symptoms were "constantly" severe enough to interfere with attention and concentration needed to perform simple work tasks.  (R. 2086.)

Dr. Schaefer completed a mental impairment questionnaire on October 30, 2018.  (R. 2095.)  Dr. Schaefer listed diagnostic impressions of major depressive disorder – single episode moderate, PTSD, and generalized anxiety disorder.  (R. 2090.)  Dr. Schaefer did not provide any information response to the form's request to "Describe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms."  (R. 2090.)

Dr. Schaefer indicated that Plaintiff had "Extreme" functional limitations as a result of her mental impairments in the area of "Concentration, persistence, or pace"; and

that Plaintiff had "Marked" limitations regarding being able to "Understand, remember, or apply information," "Interact with others," and "Adapt or manage oneself." (R. 2091.) In response to the form's prompt to "[e]xplain limitations falling in the marked or extreme categories . . . and include the medical/clinical findings that support this assessment," Dr. Schaefer wrote as follows:

> [Plaintiff]'s mental health symptoms cause impairment in her concentration and ability to follow-through with task completion. Her emotions can be quite labile with stress which cause her to shut down and [sic] times and can trigger debilitating anxiety and bouts of crying. These symptoms would make it exceptionally difficult, if not impossible to deal with stressors or work and interacting with the public.

(R. 2091.)

Dr. Schaefer identified the following as Plaintiff's signs and symptoms: decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress, persistent disturbances of mood or affect, emotional withdrawal or isolation, emotional lability, easy distractibility, and sleep disturbance. (R. 2092.)

Regarding Plaintiff's ability to do work-related activities for unskilled work, Dr. Schaefer checked: "No useful ability to function" with respect to being able to maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress;

"Unable to meet competitive standards" regarding being able to sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions; "Seriously limited, but not precluded" from remembering work-like procedures; and "Limited but satisfactory" as to asking simple questions or requesting assistance and understanding and remembering very short and simple instructions.  (R. 2093.)  In response to the form's prompt to "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment," Dr. Schaefer wrote, "I do not believe she can cope with even average amounts of work-stress.  Stress creates her mental and physical health symptoms to get worse and she is unable to commit to a consistent schedule/routine because she never knows when her symptoms will get worse."  (R. 2093.)

Regarding Plaintiff's ability to do work-related activities for semiskilled work, Dr. Schaefer checked: "No useful ability to function" for "Unable to meet competitive standards" for understanding and remembering detailed instructions and dealing with stress of semiskilled and skilled work; and "Unable to meet competitive standards" for carrying out detailed instructions and setting realistic goals or make plans independently of others.  (R. 2093.)  In response to the form's prompt to "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that

support this assessment," Dr. Schaefer wrote, "Any stress of work is likely to trigger symptoms of trauma/anxiety for [Plaintiff.]"  (R. 2094.)

Regarding Plaintiff's ability to do work-related activities for particular types of jobs, Dr. Schaefer checked: "Unable to meet competitive standards" for interacting appropriately with the general public and travel in unfamiliar place; "Seriously limited, but not precluded" for maintaining socially appropriate behavior; and "Limited but satisfactory" for adhering to basic standards of neatness and cleanliness and using public transportation.  (R. 2094.)  In response to the form's prompt to "[e]xplain limitations falling in the three most limited categories . . . and include the medical/clinical findings that support this assessment," Dr. Schaefer wrote, "[Plaintiff] is a kind and friendly person, however, her symptoms lead to bouts of crying and difficulty having conversation – this would make it difficult to interact 'appropriately' with the public."  (R. 2094.)

Dr. Schaefer stated that Plaintiff did not have low IQ or reduced intellectual functioning, but noted, "While I have not assessed [Plaintiff]'s IQ, it seems likely that her working memory may be impaired due to stress-related symptoms."  (R. 2094.)  Dr. Schaefer also indicated that Plaintiff's psychiatric condition exacerbates her experience of pain or another physical symptom and stated in explanation, "Stress, anxiety, and depression is well known to exacerbate physical conditions."  (R. 2094.)

Dr. Schaefer selected options on the form indicating that Plaintiff's impairments or treatment would cause her to be absent from work more than four days per month on average; that Plaintiff's impairment lasted or can be expected to last at least twelve months, that Plaintiff was not a malingerer; and that Plaintiff's impairments were

reasonably consistent with the symptoms and functional limitations described in the evaluation.  (R. 2095.)  Regarding any additional reasons why Plaintiff would have difficulty working at a regular job on a sustained basis, Dr. Schaefer wrote, "[Plaintiff]'s poor concentration, low energy, and emotional symptoms cause her to be unable to complete tasks in a timely manner.  She needs frequent breaks and to be self-paced."  (R. 2095.)  In response to the question, "Does your patient's mental health preclude them from working with the general public?" Dr. Schaefer checked "Yes" and wrote, "When her symptoms of trauma are triggered she has crying spells that she is unable to control." (R. 2095.)

## C.     Testimony of Plaintiff

Plaintiff submitted an affidavit dated November 6, 2018.  (R. 318.)  Plaintiff stated that after returning home from the nursing home in 2016, she "suffered from a host of ongoing chronic disabling conditions," including "confusion, memory loss, and worsening mental health issues."  (R. 319.)  Plaintiff stated that in 2016 and 2017, "due to worsening mental health, I began treating with a mental health therapist," Dr. Schaefer. (R. 321.)  She noted that in her November 2016 application for disability benefits, she indicated that she "suffered from significant severe fatigue, sleep apnea, anxiety, ocular migraine headaches, anemia, chronic kidney disease and additional conditions that could not be listed due to limitations on space."  (R. 321.)  She stated that since that time, her conditions had not improved, and she suffered "from a host of disabling conditions, including generalized fatigue."  Plaintiff stated that her "chronic fatigue greatly impairs [her] ability to concentrate," that she "cannot have an extended period of concentration of

37

focus as a result of [her] fatigue as it affects [her] concentration and focus," and that

"[e]xtended periods of concentration exacerbate [her] fatigue and lead to the need for rest

breaks." (R. 321.)  Plaintiff stated that she also has post-ICU/post-sepsis syndrome,

which is largely what led to her chronic fatigue syndrome, and the resulting symptoms

"led to an increase in depression, concentration limitations, anxiety and short-term

memory deficient," and that "[t]his condition constantly interferes with [her] attention

and concentration." (R. 321.)  Plaintiff further described her mental health as follows:

> Additionally, as a result of this condition, I have had worsening mental
> health, including worsening depression and anxiety.  I feel the anxiety is the
> worst.  My depression and anxiety have led to bouts of great sadness.  I find
> that I now frequently have crying spells.  I deeply grieve the loss of
> functioning of my past life.  I have generalized feelings of helplessness about
> the future as I have great concerns that I will never be able to return to the
> functioning in my past life.  This has given me generalized sadness that is
> always close to my heart.  I worry greatly about my future.  I ruminate on
> thoughts that I cannot escape.  A huge part of my underlying anxiety deals
> with my uncertain financial future.  Prior to this condition, I had clear
> financial stability and now my whole financial future is in flux.  I worry
> greatly about my inability to take care of myself and my inability to return to
> work.  My many medical issues exacerbate the anxiety.  I worry especially
> about the chronic kidney disease . . . .
>
> Additionally, I also have post-traumatic stress disorder.  My PTSD is
> triggered by talking about and ruminating on my physical health.  I find it
> very difficult to engage in the process of appealing for social security
> disability benefits or appealing a denial of long-term disability care.  I am
> traumatized additionally by a history of past childhood trauma which, as a
> result of this recent increase in destabilizing mental health has become a more
> present factor in my life and that past trauma has become more real because
> of the overall worsening of my physical and mental health.  I basically felt
> helpless repeatedly through this illness which reminded me of feeling
> helpless then.
>
> As a result of all of my conditions, I remain completely and totally disabled.
> My chronic fatigue would make it impossible for me to maintain a consistent
> attendance and consistent focus at any job.  . . .

Additionally, my worsening mental health and my fatigue and fibromyalgia would limit me from any meaningful work.

(R. 322 (paragraph numbering omitted).)

At the hearing in front of the ALJ, Plaintiff testified as follows regarding her mental health:

- "I see a therapist for this stuff too.  But a lot of the post-traumatic stress stuff came from that stay at Regency.  It just wasn't a good stay.  But I was there for seven weeks, and then I went to the nursing home . . . ."  (R. 50.)

- "I have anxiety.  I get like -- I get panic attacks.  I'm diagnosed with a post-traumatic stress disorder.  Talking to my therapist about that, that's what the tears are.  And I apologize that I get so emotional, but it's like -- it's like talking about this stuff is just so hard.  And I ask my therapist about it, and she said it's like rubbing wool, that every time you have to remember it or talk about it, it just brings back the grief of it."  (R. 54.)

- "I feel like my memory -- I mean, I still think it's pretty good, but it's just not quite as good as it was.  I get overwhelmed easy."  (R. 57.)

- "I cry a lot.  It's just the grief.  I assume it's something I just need to work still through the process, everything.  But, yeah, I cry a lot, and I know like a lot of doctors want to give that diagnosis of depression, and I'm sure there are some components to it.  But I know myself pretty well, and it's sadness and it's grief."  (R. 58.)

### III.   <u>LEGAL STANDARD</u>

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018).  As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means— and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (cleaned up). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (cleaned up). "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.   **DISCUSSION**

Plaintiff raises two issues to the Court, arguing that the ALJ erred at steps two and four of the sequential evaluation, "stem[ming] from the failure of the ALJ to place any limitations on [Plaintiff]'s mental functioning." (Dkt. 18 at 24.)

A.      **Step Two**

Plaintiff first argues that the ALJ erred at step two "because he found that **none** of [Plaintiff]'s mental health disabling conditions were severe." (Dkt. 18 at 24.) Specifically, Plaintiff highlights records indicating that she "is often tearful when in a clinical setting," "has a depressed affect and outlook," "takes medications for anxiety and depression," and "is in therapy," each of which "indicate that [Plaintiff]'s mental health has more than minimal impact on her functioning and each is minimized in one way or another by the ALJ." (*Id.* (citations omitted).) Defendant responds that "[t]he ALJ discussed Plaintiff's testimony regarding PTSD and throughout his decision, the ALJ addressed relevant treatment, clinical findings, and observations pertinent to his evaluation of each of the three impairments." (Dkt. 20 at 7.)

At the second step, the SSA considers "the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). It is a claimant's burden to demonstrate a severe medically determinable impairment or combination of impairments at step two of the sequential evaluation. *See Kirby v. Astrue*, 500 F. 3d 705, 707-08 (8th Cir. 2007) (citations omitted). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* at 707 (citation omitted); 20 C.F.R. § 404.1520(c). The severity showing "is not an onerous requirement for the claimant to meet, but it is also not a toothless standard." *Id.* at 708 (citations omitted).

In determining the severity of a claimant's mental impairments at step two of the sequential evaluation, the ALJ must use the "special technique" described in 20 C.F.R.

§ 404.1520a.  *See Cuthrell v. Astrue*, 702 F.3d 1114, 1117 (8th Cir. 2013).  The ALJ first "evaluate[s] [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1).  The ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, maintain pace; and (4) adapt or manage oneself.  *See id.* § 404.1520a(c)(3).  The criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme.  *See id.* § 404.1520a(c)(4).  Pursuant to the Commissioner's regulations, "[i]f we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

"[T]o be considered a severe impairment at step two, a mental impairment need not cause marked restrictions."  *Timi W. v. Berryhill*, No. 117CV01366SLDEIL, 2019 WL 1227840, at *2 (C.D. Ill. Mar. 15, 2019) (citing 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' [as opposed to moderate, marked, or extreme,] we will generally conclude that your impairment(s) is not severe . . . .")).  Indeed, courts have concluded that a "moderate" limitation is sufficient to support a finding of "severity" at the second step of the process.  *See Vicky R. v. Saul*, No. 19-CV-2530 (ADM/ECW), 2021 WL 536297, at *8 (D. Minn. Jan. 28, 2021) (collecting cases), *R.&R. adopted*, 2021 WL 533685 (D. Minn. Feb. 12, 2021)

With respect to step two, the ALJ found that Plaintiff's "medically determinable mental impairments of posttraumatic stress disorder (PTSD), major depressive disorder, and generalized anxiety disorder considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." (R. 14.) The ALJ then summarized Plaintiff's medical records relevant to her mental impairments, including her own testimony and various treatment records. (R. 14-16.) The ALJ detailed his consideration of the four broad functional areas, finding that Plaintiff had no limitation in understanding, remembering, and applying information; had a mild limitation in interacting with others; had a mild limitation in concentrating, persisting, and maintaining pace; and a mild limitation in adapting or managing oneself, and concluded, "Because the claimant's medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas, they are nonsevere." (R. 16-17.) The ALJ also discussed the opinion evidence regarding mental health. (R. 17-18.)

The Court first addresses Plaintiff's argument that the ALJ did not address why he discounted Plaintiff's PTSD and ignored that condition. (*See* Dkt. 18 at 25.) This argument is not borne out by the record. The ALJ expressly considered Plaintiff's PTSD, and acknowledged Plaintiff's testimony as to her emotional state, mental health, and ability to concentrate, socialize, deal with changes in routine, deal with people, and tolerate stress. (R. 14.) He also acknowledged, when reviewing Plaintiff's medical records, her reports of anxiety and depression; observations of a sad, depressed, tearful, and anxious affect at times; and her PTSD diagnoses. (R. 14-15.) The ALJ explained,

however, that he gave great weight to Dr. Bourdeaux-Colburn's January 2017 clinical observations and opinions.  (R. 15.)  As the ALJ noted, Dr. Bourdeaux-Colburn observed that Plaintiff "reported her typical mood as 'in general good, but sometimes sad,'" and, while Plaintiff endorsed symptoms of depression and anxiety, her mental status examination found a normal appearance, activity level, and speech; Plaintiff was cooperative and attentive and had a fairly stable affect with "[s]ome tears" noted; there was no evidence of a thought disorder; Plaintiff held a normal conversation; and observations and tests regarding attention, information, and abstraction had adequate or normal results.  (R. 1545-46; *see also* R. 15 (discussing observations).)  Dr. Bourdeaux-Colburn opined that Plaintiff was able to understand and follow directions, sustain attention and concentration, and carry out work-like tasks with reasonable persistence and pace.  (R. 1546)  She also opined that Plaintiff could relate appropriately with at least brief and superficial contact with coworkers and supervisors and that Plaintiff could tolerate the mental stressors of at least an entry level workplace.  (R. 1456.)  Plaintiff has not identified any reason why the ALJ should have discounted Dr. Bourdeaux-Colburn's opinions.

Plaintiff also argues that the ALJ "ignored" her PTSD and gave Dr. Schaefer's (identified as Plaintiff's therapist) opinion no weight.  (Dkt. 18 at 25.)  As discussed above, the ALJ did not ignore Plaintiff's PTSD.  Moreover, the ALJ explained that he gave the Mental Impairment Questionnaire from May 2017 filled out by Dr. Schaefer no weight because "the opinion is not supported by the objective medical findings which show generally unremarkable or normal mental status except for tearfulness, anxiety, and

sad mood"; "Dr. Schaefer failed to provide a function-by-function data driven correlation between documented objective findings and specific limitations but rather relies on diagnosis and subjective complaints"; and "Dr. Schaefer's records show no memory impairment, nor do those of other medical practitioners."  (R. 17-18.)  The ALJ also noted that Dr. Schaefer's report was "internally contradictory in multiple areas including an opinion of no limitation of interacting with others but at the same time serious socially based impairment preventing public interaction."  (R. 18.)  The ALJ discounted Dr. Schaefer's October 30, 2018 Mental Impairment Questionnaire for similar reasons.  (R. 18.)

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.  An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight.  For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'"  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citations omitted).  "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions."  *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) ("However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better

or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." (alteration in original)).

Here, Plaintiff has not identified any objective medical findings that contradict the weight the ALJ assigned Dr. Schaefer's opinions, and indeed, numerous mental status examinations conducted in 2017 and 2018 found Plaintiff had normal or relatively normal mental status except for tearfulness, anxiety, and sad mood. (R. 1569, R. 1545-46, R. 1951, R. 3000, R. 3029, R. 3005.) As the ALJ noted, Dr. Schaefer's May 2017 opinions are internally contradictory, including that she said Plaintiff had an "Unlimited or Very Good" ability to "Interact appropriately with the general public" (R. 1598) and "Limited but satisfactory" ability to "Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes" (R. 1597) but also that Plaintiff's "current emotional difficulties would likely impair her ability to . . . work with others" (R. 1597) and that she was "Seriously limited, but not precluded" from maintaining socially appropriate behavior (R. 1598). Further, as the ALJ noted, Dr. Schaefer's notes and observations did not support her opinions. (*See* R. 17 ("There is only intermittent counseling with Dr. Schaefer, . . . and this rarely if ever discusses panic attacks, cognitive or concentration problems, or social difficulty. Dr. Schaefer's PHQ-9 and GAD-7 anxiety self-reports are all in the mild range. These reports from physical care providers are also no more than mild for depression, and mild to moderate with anxiety.") (citations omitted).) Finally, Dr. Schaefer's May 2017 opinions are inconsistent with those of Dr. Bourdeaux-Colburn's observations and opinions, as discussed above, which the ALJ gave

great weight. The Court finds the ALJ's decision to give Dr. Schaefer's May 2017 and October 2018 opinions no weight was not in error.

Moreover, numerous mental status exams in 2017 and 2018 (including Dr. Schaefer's) showed Plaintiff was alert and oriented, had intact insight and judgment, was appropriately dressed and groomed, and had normal thought processes. (*See*, *e.g.*, R. 1545-46 (Jan. 27, 2017), R. 1589 (Mar. 22, 2017); R. 1575 (Oct. 10, 2017); R. 1578 (Jan. 18, 2018); R. 1581 (Feb. 15, 2018), R. 1569 (Feb. 15, 2018).) Plaintiff declined medication for her anxiety and depression in early 2016. (R. 829 (Feb. 17, 2016); R. 848 (Feb. 24, 2016); R. 868 (Mar. 9, 2016).) At some point in 2016, she began taking Ativan for her anxiety, and as of December 2016, was decreasing her dosage. (R. 1948.) As of March 22, 2017, she was no longer taking medication for her anxiety (R. 1590), and she declined antidepressants and SSRIs several times in 2017 and 2018 (R. 1957 (Apr. 3, 2017); R. 2003 (July 24, 2017); R. 1566 (Apr. 4, 2018)). Plaintiff's reliance on therapy and limited medication supports the ALJ's conclusion that her mental health impairments were non-severe. *See Wasen A.*, 2020 WL 823095, at *15 ("A conservative treatment plan is evidence that a claimant's symptoms are not as severe as alleged.") (collecting cases); *see also Buford v. Colvin*, 824 F.3d 793, 797 (8th Cir. 2016) ("[T]he conservative treatment, management with medication, and lack of required surgical intervention all support the ALJ's RFC determination.") (citation omitted). At times, Plaintiff denied depression, anxiety, and difficulties in memory or concentrating. (R. 1416 (Sept. 23, 2016); R. 2055 (Nov. 24, 2017); R. 2980 (Sept. 23, 2016).)

Plaintiff cites no evidence contrary to that relied on by the ALJ regarding

functional limitations.  (*See* Dkt. 18 at 24-25.)  Plaintiff cites several indicators of mental

health issues (*see id.* at 24), but none of these—tearfulness, depressed affect, and outlook,

or taking medications for anxiety and depression—on their own or in combination dictate

a *per se* conclusion of a severe impairment.  *See Wasen A. v. Saul*, No.

18CV03242SRNLIB, 2020 WL 823095, at *14 (D. Minn. Jan. 31, 2020) (*quoting*

*Michlitsch v. Berryhill*, No. 17-cv-3470 (MJD/TNL), 2018 WL 3150267, at *14 (D.

Minn. June 12, 2018)) ("'Diagnoses alone do not demonstrate the existence of severe

impairments.'"), *R.&R. adopted*, 2020 WL 818908 (D. Minn. Feb. 19, 2020); *Martin v.

Astrue*, No. 09-cv-1998 (RHK/JJG), 2010 WL 2787437 at *6 (D. Minn. June 7, 2010)

(citing *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990)) ("The mere presence of a

medical condition is not per se disabling.  The claimant must also show that the condition

causes functional limitations.").  While Plaintiff argues that "[e]ach of these factors

indicate that [Plaintiff]'s mental health has more than minimal impact on her functioning"

(Dkt. 18 at 24), Plaintiff does not identify what that impact is.  She cites no medical

evidence supporting any functional limitations caused by Plaintiff's mental health

conditions, other than some opinion evidence that, as the ALJ explained, is not consistent

with the objective medical evidence.  (*See, e.g.*, R. 18 (explaining why no weight was

given to Dr. Schaefer's May 2017 and October 2018 opinions).)

For these reasons, the Court finds that substantial evidence supports the ALJ's

conclusion as to the severity of Plaintiff's mental health impairments, namely that

Plaintiff's PTSD, major depressive disorder, and generalized anxiety disorder, whether

considered singly or in combination, do not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities.  (R. 14.)  *See Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011) (citing *Trenary*, 898 F.2d at 1364) ("Buckner does not challenge either Dr. Sutton's or the ALJ's findings in these four functional areas. Instead, he argues that, despite these findings, the evidence showed that his depression and anxiety had 'more than a minimal impact' on his ability to do basic work activities. To the contrary, the evidence in the administrative record shows that Buckner's depression and anxiety resulted in very few limitations.  . . . .  In sum, although Buckner was diagnosed with depression and anxiety, substantial evidence on the record supports the ALJ's finding that his depression and anxiety was not severe.").

## B.  Step Four

As Plaintiff acknowledges, the ALJ stated in his decision that, notwithstanding his finding that as to the non-severity of Plaintiff's mental health impairments, he was required to consider the effect those impairments "would have on the ability to function" and did so when formulating his RFC.  (Dkt. 18 at 26; *id.* n.1; *see also* R. 18.)  Plaintiff argues that the ALJ made "no mention of what mental factors he weighted and apparently discounted," and "any consideration of non-severe mental impairments at Step Four is flat out ignored."  (Dkt. 18 at 26; *see also id.* at 31 ("He cannot outright ignore these factors as he does").)

On the contrary, the ALJ's RFC analysis notes and discusses Plaintiff's mental health impairments.  (R. 20 (listing Plaintiff's allegations, including PTSD, anxiety, and cognitive dysfunction); R. 21 ("During admission, a psychiatric consultation diagnosed

an anxiety disorder not otherwise specified, and chronic pain syndrome although she declined SSRI medication."); R. 24 ("He assessed . . . PTSD, moderate major depressive disorder, and a generalized anxiety disorder with panic attacks."); R. 24 ("[Dr. Petersen's]) mental status examination was normal at that time.").)  Moreover, the ALJ specifically noted why several opinions regarding mental impairments and functional limitations were given no or minimal weight.  (R. 24 ("Physician's assistant Phillips opined the claimant continued to have affects such as chronic fatigue pain, decreased memory function, difficulty concentrating and waxing and waning kidney function such that the claimant will not be able to hold a job of any sort.  As before, the nonprogrammatic opinion receives no weight.  Ms. Phillips also acknowledged that available hospital records did not support cognitive deficits.") (citations omitted); R. 24 ("No weight is given to this opinion [of Dr. Petersen].  Mental status examination and physical findings were not particularly dramatic . . . ."); R. 27-28 ("[I]n this form, [Dr. Petersen] noted _self-reported_ memory and concentration problems as opposed to Ms. Phillips and Dr. Mohammed that reports short-term memory, visual-spatial, and concentration limitations . . . .  He included no mental _findings_.  . . .  In sum, the undersigned finds that these check mark opinions provide little objective data to support the functional restrictions opined and that the medical findings that are documents do not show the severity of limitation set forth in these reports.") (citations omitted).) Ultimately, the ALJ concluded, "Cumulatively, the record suggests that the claimant has valid physical and mental health concerns that do limit her ability to function, but the record as a whole supports the residual functional capacity and does not show that the

limitations rise to the disabling level alleged." (R. 28.) Given these findings and discussion by the ALJ, it is evident that the ALJ considered Plaintiff's mental impairments in the RFC determination, and the Court finds Plaintiff's argument that the ALJ ignored her mental impairments unpersuasive.

Moreover, the ALJ's consideration of Plaintiff's mental impairments when formulating the RFC has implications for Plaintiff's step two argument. In *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007), the plaintiff contended that she was disabled, in part, due to borderline intellectual functioning. *Id.* at 886. On appeal, the plaintiff "assert[ed] that the ALJ erred in failing to include her diagnosis of borderline intellectual functioning as a severe impairment at step two of the sequential analysis." *Id.* at 887. Although the Commissioner in *Nicola* conceded that the plaintiff's borderline intellectual functioning should have been considered a severe impairment, the Commissioner argued that the ALJ's error was harmless. *Id.* The Court of Appeals for the Eighth Circuit "reject[ed] the Commissioner's argument of harmless error," noting that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Id.*

Courts have been split regarding whether an error at step two can be harmless. "Some Courts have interpreted *Nicola* to mean that an error at step two can never be harmless." *Lund v. Colvin*, No. 13-cv-113 JSM, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (collecting cases); *see also Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment,

will warrant a reversal and remand, even where the ALJ found other impairments to be severe."). Other courts, including other courts in this District, have refused to interpret *Nicola* as establishing a *per se* rule that any error at step two is a reversible error. *See Lund*, 2014 WL 1153508, at *26 (collecting cases).

In the absence of clear direction from the Eighth Circuit, the prevailing view of courts in this District has been that an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC. *See, e.g.*, *Rosalind J. G. v. Berryhill*, No. 18-cv-82 (TNL), 2019 WL 1386734, at *20 (D. Minn. Mar. 27, 2019) ("Consistent with the prevailing view in this District, any potential error by the ALJ in not including Plaintiff's chronic pain syndrome as a severe impairment at step two was harmless based on the ALJ's consideration of the intensity, persistence, and functional effects of Plaintiff's pain when determining her residual functional capacity."); *David G. v. Berryhill*, No. 17-CV-3671 (HB), 2018 WL 4572981, at *4 (D. Minn. Sept. 24, 2018); *Tresise v. Berryhill*, No. 16-cv-3814 (HB), 2018 WL 1141375, at *5 (D. Minn. Mar. 2, 2018) ("Courts in this district have followed the approach set forth in *Nicola* and determined that reversal based on errors at step two is only warranted when the ALJ fails to consider the omitted impairments in the RFC."); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity."). Here, where the ALJ expressly acknowledged his duty to consider Plaintiff's mental health impairments when

formulating the RFC and addressed those impairments in his analysis, any error at step two is harmless.

The Court considers Plaintiff's argument that her RFC was in error because it did not incorporate any limitations resulting from her mental health impairments. (*See* Dkt. 18 at 26-31.) A disability claimant has the burden to establish her RFC. *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Id.* (quoting *Myers*, 721 F.3d at 527). Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Perks*, 687 F.3d at 1092 (citations omitted) (quoting *Cox*, 495 F.3d at 619-20).

"[T]he mere presence of a mental disturbance is not disabling per se; rather a claimant must show a severe functional loss establishing an inability to engage in

substantial gainful activity." *Budo v. Astrue*, No. 4:12CV187 JAR TIA, 2013 WL

1183364, at *22 (E.D. Mo. Mar. 5, 2013) (citing *Trenary*, 898 F.2d at 1364), *R.&R.*

*adopted sub nom. Budo v. Colvin*, 2013 WL 1182059 (E.D. Mo. Mar. 21, 2013). The

Court finds Plaintiff's arguments as to her mental impairments generally unpersuasive

because Plaintiff did not identify what functional limitations she believes should have

been considered. Instead, she relies on her diagnoses and certain observations and self-

reports from medical records. (Dkt. 18 at 27-31.) But, to the extent Plaintiff identifies

medical records indicating fatigue, weakness, and cognitive difficulties (Dkt. 18 at 29-

31), "this court does not reverse even if it would reach a different conclusion [than the

ALJ], or merely because substantial evidence supports the contrary conclusion." *Nash*,

907 F.3d at 1089 (cleaned up). The ALJ explained in his step two analysis why he found

evidence of cognitive difficulties unpersuasive (R. 16-17), and the Court finds substantial

evidence supports his conclusion.

To the extent Plaintiff relies on her diagnoses of PTSD, anxiety, and depression,

"[a]lthough an ALJ should consider both severe and non-severe impairments when

determining a claimant's RFC, if the record does not support limitations from the non-

severe impairment, the ALJ need not account for the impairment." *Shane T. v. Saul*, No.

CV 18-634 (BRT), 2019 WL 4143881, at *5 (D. Minn. Aug. 30, 2019) (citing

*Hilkemeyer*, 380 F.3d at 445); *see also Hilkemeyer*, 380 F.3d at 447 ("Hilkemeyer argues

that due to her pulmonary dysfunction her RFC should have limited her exposure to

fumes, odors, dust, gases, and poor ventilation. Medical evidence in the record indicated

only a mild pulmonary dysfunction. The ALJ's decision not to incorporate this mild

pulmonary dysfunction in the RFC, as well as in the hypothetical posed to the VE, was not error because the record does not suggest there were any limitations caused by this nonsevere impairment."). The ALJ explained in detail in his step two analysis the weight assigned to the medical opinions and why he concluded the impairments were not severe and did not result in functional limitations. (R. 14-18.) As discussed in Section IV.A, the Court finds substantial evidence supports his conclusions, including as to the absence of functional limitations resulting from mental health impairments. While Plaintiff asserts their "implications are clear" (Dkt. 18 at 27), this assertion is not a sufficient basis to overturn the ALJ's decision where Plaintiff has not identified what the limitations should be or provided any meaningful explanation (instead of simply citing the impairments' existence) of how the ALJ erred.

The Court notes that Plaintiff includes pain and chronic fatigue in her list of "mental impairments that should have been considered." (Dkt. 18 at 27, 29-30.) The ALJ did take fatigue into account in the RFC, stating, "[B]ecause the treating providers consistently support exertional limitations and provide some nexus between complaints of weakness and fatigue to the chronic kidney disease, and all provide some degree of postural restriction, the undersigned gives only partial weight to [opinions finding] a reduced range of light exertion work," and, "[T]he record in sum suggests a greater degree of limitation and this is reflected in the above residual functional capacity." (R. 28.) The ALJ therefore restricted Plaintiff to sedentary work. (R. 19.) Plaintiff does not explain how pain and chronic fatigue relate to her mental impairments, as opposed to her physical impairments, or what additional limitations should have been included in the

RFC based on pain and chronic fatigue, and the Court cannot develop a basis on her behalf. The Court finds that substantial evidence supports the ALJ's conclusion that a restriction to sedentary work adequately addressed Plaintiff's pain and chronic fatigue.

In sum, substantial evidence in the record indicates that Plaintiff's mental impairments did not support limitations to Plaintiff's ability to function in the workplace. Accordingly, the ALJ did not err by not including a limitation in the RFC that would relate to Plaintiff's mental impairments.

## V.   ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff Melanee B.'s Motion for Summary Judgment (Dkt. 17) is **DENIED**;

2.       Defendant's Motion for Summary Judgment (Dkt. 21) is **GRANTED**; and

3.      This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**


DATED: September 15, 2021                    *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge